The next case we are going to hear today is United States v. Rand and Mr. Waxman, whenever you are ready, we will hear from you. Take your time. May it please the court. The Constitution guarantees criminal defendants a, quote, meaningful opportunity to present a complete defense. Michael Rand was denied that opportunity. Before I go to the confession statements or the alleged confession statements, I think it's well to step back and reflect on the fact that this was an accounting fraud case. Before trial, Mr. Rand tried to subpoena his former employer to access the very accounting records he was accused of falsifying. The district court denied that request and it then refused to allow Mr. Rand to introduce the work product of the company's external auditors who did have access to the accounting records, who did examine most of the specific transactions the government challenged, and who did find those adjustments to be proper. Now, the government says, well, Mr. Rand confessed. But that only confirms how deeply unfair this trial was. Mr. Rand was not allowed to explain to the jury why he felt compelled to tell the prosecution what he thought they wanted to hear. The district court would not allow one word of argument or evidence about the government's prior false accusations against him. And that violated a foundational right to, and I'm quoting from Crane, describe to the jury the circumstances that prompted his confession to answer the one question every rational juror needs answered. If the defendant is innocent, why did he previously admit his guilt? And in summation closing, rebuttal closing, the prosecutor exploited and exploited beyond the range of propriety that error, that craned error. The prosecutor told the jury, well, Mr. Rand confessed. He said that he was desperate. Well, why was he desperate? He didn't say. And then he went on to say, but that just doesn't make sense. I lied because I was desperate about something. I don't know what. He knew what. And the what was precisely the thing that Mr. Rand was not allowed to explain to the jury. And so in total, this is not a sufficiency argument. This is a question of whether the defendant really had a meaningful opportunity to present a complete defense. You know, the circumstances of the earlier documents that were deleted are not quite as clear as what you're saying. I mean, number one, this is not a case where the government misrepresented the fact that maybe a co-conspirator was squealing or talking against him. Here's a case where the government showed Rand the evidence they had against him. And in that 78-page PowerPoint, a few pages were devoted to the destroyed documents. And it wasn't a fact that that was false. It's a fact that it was overstated. There still were some 800 documents that had been destroyed at that point. And if he started with just the 800, he would still have the pressure. And then there was the 6,000 that clearly he destroyed. And they confronted him with it. He knows the truth. It's not a question where the government used something false that he didn't know about. Basically, he's saying, well, they caught me. And so I'm going to have to plead because there's the evidence. They laid it out. So the statement that he confessed because of a false statement is really pretty strong in view of those facts. Well, Judge Niemeyer, with respect, I want to take issue with the court's understanding of some of those facts. He was accused, yes, of deleting 3,500 e-mails. And it turns out that 776 of those e-mails weren't deleted. Those 776 e-mails were utterly innocuous. They were bulk deletions from jokesgalore.com and from two female friends having nothing to do with anything. But at the very same time, he was shown 6,000 documents, which he did delete, which had material. What he would have said, and with respect, what the reverse proffer evidence showed, and he was entitled to tell a story. He was told that he was engaged in an accounting fraud. And the proof of that fraud was that he was deleting hundreds or thousands of e-mails about accounting issues with the chief financial officer and the chief executive officer of the company. And that was what the government wanted his cooperation about, that he knew that he was engaged in accounting fraud because he went through, between the time the grand jury subpoena issued and the 28th or the 30th, and deleted hundreds or thousands of accounting e-mails with his superiors. That was false. Now, we're not saying that the government was. It was thousands. It was not. The prompter got over 6,000, right? There were 6,000 e-mails deleted on the 30th. There was not an e-mail deleted. There were no bulk e-mails deleted about the focus of the prosecutor's reverse proffer, which is you have a CFO and a CEO, and you were in a conspiracy with them to misstate the reserve adjustments to meet consensus, and you deleted those e-mails with the CEO and the CFO. Judge, there's no dispute about the number of e-mails that were deleted. No, but my point is your brief and your argument assumes that everything they told them about the earlier deletions were false. No, it doesn't. The actual statement is that it was overstated, that the evidence showed that of the 3,200 or 3,500, 800 still were demonstrably deleted. What Mr. Rand would have said and what was proffered by his counsel to the trial judge was that he felt desperate because he had been accused and falsely accused of systematically deleting not e-mails. There was no dispute that this man had been ordered by the company to radically reduce the size of his e-mail accounts. But just the opposite. There was a memo that came from counsel that said, save all e-mails. And after he received that, he started deleting. No, that is, with respect, that is incorrect. The evidence in the case. He started actually with the grand jury subpoena when that came out. But by the time he deleted into the dumpster, he was violating in-house counsel's orders. With respect, Judge Niemeyer, the testimony, and there's no dispute about this, is the company issued seven hold memoranda prior to 4-19 on the 30th. Not a single one of them went to Mr. Rand because Mr. Rand had nothing to do with the Charlotte Division mortgage operation. On 4-19 on the 30th, right after a civil lawsuit had been filed against the company and Mr. Rand, he received a document hold memorandum, which he opened at 4-25 that afternoon. And the government will confirm that he did not delete a single e-mail after opening that hold memorandum. There's no dispute about that. And prior to that time, yes, there was. He was deleting. He seems to have gone through his sent items and deleted all of the e-mails from people whose first name was J, K, and L. So like seven or eight Lisas and Jimmy and jokes galore. And this was, with respect, if we're talking now, Judge Niemeyer, I was originally addressing the court's error in not allowing him either to have access to any of the accounting records in support of a defense that it was reasonable. Had he learned of the grand jury subpoena? He testified that he knew that there was a grand jury subpoena alleging mortgage origination fraud in Charlotte. He was not involved in any way in that and didn't consider himself to be involved in that. And he was not the subject of not just one, but seven successive hold memoranda that went out from the company's counsel. When he did get an instruction not to delete e-mails, which is after the civil suit was filed and which referenced the civil suit, he didn't delete e-mails. And the salient point here is, I mean, first of all, there's the accounting violations, and I respectfully submit that there is no justification for denying. I'm not aware of any case in which a defendant in an accounting fraud case was not allowed to have access to the actual accounting records that he was alleged to have falsified as part of a defense that all of the adjustments were, in fact, reasonable. And the salient point about not allowing him to explain to the jury why he felt desperate, he's told there is irrefutable forensic evidence that you were massively deleting accounting-related e-mails with the CFO and the CEO of the company. That is the kind of thing that Crane says. That's the one question every rational juror wants to know. Why did he then make incriminatory statements to the FBI? And in light of the fact that he was disabled from showing that his reserve accounting judgments were correct, in fact, were reasonable, and in fact, not only in his mind were they and not only did the records actually show that he was, Deloitte and Touche, which had access to all of these records, and whose work papers included the spreadsheets showing these reserve adjustments, also concluded that. And its summation, the prosecution comes and focuses from the very first word of the rebuttal summation until the penultimate sentence of the rebuttal summation to the fact that this is a guy who was, who bought his lawyers with bags of gold, who bought his experts with bags of gold, and who never told us why it was that he was desperate when the prosecutor knew he had been trying throughout the trial to be able to explain what his reasons were for making inculpatory statements. Yes. And the proffer, as you call it, reverse proffer would have been, what explanation would have gone to why he made the deletion? You seem to be focusing on he would have had an explanation as to why what he did was correct from an accounting standpoint. What would have explained why? And that's what most jurors would have been concerned about, whether it violated an order or not. Why were you deleting? Tell me again, what was that? Sure. So his explanation for deleting emails, and again, I don't think there's any dispute about this, is the company had issued a directive in general, and there was testimony that he was particularly instructed that his email box, and the guy had 200,000 emails or 187,000 emails, that he had to systematically reduce the size of his email folders. And the evidence showed, and this was sometime in I believe late 2006, that he actually would go through and block delete, not by searching for terms like mortgage or something like that in deleting, he would just go through and delete emails with personal friends or people who were former employees, who were no longer with the company, or, you know, things like auto dealing. Everything that was deleted was in that swath of just sort of categorical deletion. That's absolutely right, and there was expert testimony about this. He was not allowed to explain that to the jury? Do you say that? Well, he didn't, his, the jury heard that his deletions were bulk deletions, and that he didn't go through, for example, after the subpoena was issued and say, well, let's search for all the emails having to do with Charlotte or mortgage or reserve accounting or anything like that. What he wasn't, I mean, the point here is that the government's entire theory about the obstruction counts, and this is also in their slideshow reverse proffer, and it's what the jury was told, was why was this guy deleting emails? He was deleting emails because he knew he was involved in a reserve accounting fraud, and he wanted to hide it. And, in fact, the reverse proffer slide that goes to the deletions is called intent to defraud. It's the, no one thinks, I mean, the issue on the three obstruction convictions, there's no question, as Judge Niemeyer pointed out, what he deleted and what he didn't delete. That's, nobody disputed that. The question is, did he act with the requisite statutory intent, the intent to obstruct a grand jury investigation? And he should have been allowed to argue and explain to the jury that, not only that I was just bulk deleting and I didn't commit an accounting fraud, but the notion that when I was deleting it I was doing it with the specific intent to obstruct a mortgage origination grand jury investigation was wrong. And so it really goes to intent and his, the extent to which he was hamstrung from making his arguments. I see my time has expired. Thank you. All right, Ms. Ray. May it please the court. I'd like to open by correcting some misstatements. First of all, on page 975 of the joint appendix, Deborah Danzig, who was in-house counsel at Beezer, testified that the defendant came to her between 409 and 419 on the 30th and said, what am I supposed to retain? What do I have to retain? And she told him everything. And after that, just two minutes after 419, as I recall, is when he started deleting thousands of emails to and from Corey Boydston. Second, Anna Shelton, his expert, there was no testimony that he started deleting things based on jokes or anything like that. She testified that he deleted based on who those emails were to or from. And I want to be very clear. The government's evidence of accounting fraud were not deleted emails. The deleted emails went to obstruction of justice counts. Did they show an intent to defraud? Sure, along with multiple witnesses who testified that the accounting entries were improper. But there were all of those slides before we get to the deleted email slides, of which there were five, and two of which were legitimately deleted, one of which was the squirrel that hides the nut, the squirrel that was quite incriminating on the accounting fraud issue. But all of those slides before we get to the deletions were about accounting fraud. This case was not built on deleted emails in terms of the accounting fraud. The accounting fraud case was built on all of the accounting entries. And Mr. Rand, and I respectfully suggest that if this court looks at this very large record of this trial, one cannot escape the conclusion that he was absolutely permitted to present a defense. And he did. A vigorous defense. His expert, Bailey, was permitted to testify, and did testify, that all of those accounting entries were proper. He was also permitted to testify about why he confessed, about why he told Agent Curran. And I note that the conversation with Agent Curran occurred well after that slide. It's not like the government presented him with the reverse proffer, and then he was suddenly desperate at the same time, and just sort of spilled the beans. No. This was weeks, maybe months later, I don't remember the precise date, but it was well after. And Agent Curran himself was not at the reverse proffer. And Agent Curran testified that during that conversation, he focused on the deletions on March 30th. He did not focus on the deletions between the 23rd and the 28th, of which there were 800. So the notion that Mr. Rand was not allowed to talk about his confession or explain the circumstances, a la Crane, is just not fair. Because he was. The district court specifically said he could testify about why he confessed. He could even testify that he was falsely accused. What he couldn't do, and the only thing he couldn't do, and it was a Rule 403 decision that made very good sense, he couldn't testify that he was earlier tried, and evidence had been presented during the earlier trial, about deletions that had not actually occurred, because Judge Conrad made the reasonable decision that that would, that there's such minor probative value, given that he could testify why he confessed, and that the jury didn't hear any evidence of those deletions in the second trial, that there was a risk of confusion and distraction to the jury. And that was not an arbitrary or capricious decision. That was a reasonable decision. I have a question. He was the only one prosecuted, correct? In this trial, he was the only person. He was the only person in this trial, yes, Your Honor. Did he at all say it was framed that it was targeted prosecution? I mean, because, for example, the ones that were later found not to be, may be relevant as to this shows the aggressive nature of prosecution, the overboard going after, but was there any framework in this trial for that regard? No. I don't believe so, Your Honor. I didn't see it. I didn't, you know, I don't believe so at all. And, in fact, I just lost my train of thought because your question brought something up for me, and now I don't remember what it was. But he was permitted all along to explain the circumstances of his confession. And in terms of that confession, it mostly was related to the accounting fraud. That was what Agent Curran testified that they spoke about primarily were the accounting entries. And there was e-mail evidence of those accounting entries, but those weren't e-mails that were deleted. Mostly the deleted e-mails, what he explained during the time he spoke with Agent Curran was, I deleted e-mails because I didn't want to be caught up. I didn't want them to start sniffing around. And he talked about he deleted everything quickly that he thought was related to the mortgage business. So, for example, he deleted 960 e-mails between 3.09 and 3.10 on the 30th that were to or from Jimmy Yandel, who was related to Beezer Homes. So a number of the bulk e-mails were to or from, same with Ron Kuhn, who was the CEO of Beezer Homes. So he deleted e-mails based on sort of, just, you know, kind of keep me out of it. He didn't go, and most of our deleted e-mail evidence was not about accounting fraud. It was about relationships to people who were involved in the mortgage business, along with some personally embarrassing e-mails. So he deleted a lot to the two women in particular that I think he considered some of his e-mails perhaps inappropriate or at least personally embarrassing. But there is absolutely no dispute that he was told, regardless of when the retention notes came out, hold memos, that Mr. Waxman says there's no dispute about when he was, those sort of came through. There's also no dispute that Deborah Danzig testified that she specifically told him not to delete. And if one looks at when the subpoena was issued, and some of the deleted e-mails actually had to do with, oh, did you all see the fact that there's a subpoena? And suggestions about who might be able to help. Some of the deleted e-mails were actually kind of about, this is all coming down now, and we better start to prepare. Well, Mr. Rand's way of preparing was to just start engaging in deletions. And of course, once he got that hold memo, he stopped deleting. But he did it before, and there's no dispute about that. With respect to the subpoena issue, I would just note that the District Court's decision, Rule 17, that decision is only to be overturned if the wrong standard was applied, or if it was based on clearly erroneous facts. Neither of those circumstances is present here. The District Court noted that even after the first trial, the defendant did not narrow his request at all. He sought potentially millions of documents. And the suggestion that this gentleman was not privy to the accounting fraud journal entries and records that the government was going to base its case on is ludicrous, given that he had had a trial based on those records. He knew what the government's proof was of his accounting fraud. He knew the contours of it. So he did not narrow that request, and that was his duty to do under the Nixon standard. Can I ask you just a quick question about sentencing? Yes. The June announcement, sort of starting the damages flowing from the June announcement. Yes. Is your argument, is the premise of your argument that that's okay because he was convicted of obstruction? The only thing the June announcement talks about is the obstruction, right? Right. And that's okay, in your view, to start the fraud damages running from there because he was ultimately convicted of obstruction? Was it okay to look at damages that may have flowed from release of information about obstruction? Your Honor, it's what our, first of all, I think the broader point is that the district court made a reasonable estimate. And so that, but yes, that the expert testified that it was appropriate to begin with the June date, not because it showed obstruction per se, but it showed that the chief accounting officer of Beezer had engaged in mass deletions or had engaged in obstructive conduct. And one, of course, would presume that the market might say, well, if he's deleting something, then he did something improper or he knows of improper accounting. So that is why, and more importantly, though, I think for purposes of this court's review and under the standard that this court applies, it's appropriate because the expert testified to that and the district court could reasonably rely on that expert's testimony. Also, I note that it was a conservative estimate. I mean, at the end of the day, the court received evidence that the number could be anywhere from 150 million or whatever it was that O'Neill testified to all the way up to 451 million if one applied the method that was presumptively correct in the guidelines. But I don't think it was just the obstructive conduct. I think that obstructive conduct has to be viewed in the context of what the markets might have viewed. But didn't it say that he was deleting e-mails and then there was a reference to an entirely different fraud investigation, right, the mortgage? The mortgage. Sure. But so you're saying you can start the loss calculation running at any time sort of there's wrongdoing at the company because the market might reasonably think this will end up being about this other fraud? No, I don't think that's right, Your Honor. I think that the obstructive conduct was the first of the two. I would certainly not say that the court could just sort of willy-nilly pick out of its hat the first time anything happened. But this obstructive conduct happened to relate not just to the mortgage fraud but also to the accounting fraud. And the court could see that as part of the offense conduct related to the accounting fraud. That's what I was getting at. So it has to be part of the conduct of which he was convicted. Of course. Okay. Yes. And I think that the district court found in this case that that harm was harm caused by his offense conduct, which included deleting e-mails related to both accounting fraud and the possibility that he was connected to the mortgage fraud. In terms of the – I'm trying to remember what else Mr. Waxman discussed so that I can hit the points that the court might want argument about. But I think that the other – oh, the closing argument is the other issue that I think. Bags of gold. Right. The bags of gold. Well, your argument is that that was responsive to the analogy that they did a couple of seconds before. Exactly. And that was one of the points I was going to make, is that it was immediately before. If we look at sort of the progression of the arguments, Mr. Myers, the assistant U.S. attorney who gave the closing argument, was responding to almost the last sentence of Mr. Rand's closing. And the district court in this case specifically found that there was no improper comment on the failure to testify and that there was no comment on Mr. Rand's personal wealth. But, of course, we had testimony from his wife that he had no incentive to engage in any fraud because he was so wealthy. And so it was simply a response to that line of argument, why was he so desperate because he didn't need to be. And the suggestion that he was desperate because he saw three slides in a reverse proffer weeks and weeks before he confessed to the offense. In the whole context of this, it just doesn't make any sense. And I think the most important point on that one is that the district court gave him full latitude to explain the circumstances of the conversation he had with Detective Curran, Special Agent Curran, and why he said what he did during those conversations. Your Honors, if Your Honors don't have any further questions, the government respectfully requests this court affirm the conviction in the sentence of Mr. Rand. Thank you. Mr. Waxman. Judge Gregory, it's true that nobody else was charged in this trial. Nobody else was ever charged with anything having to do with this. This was going to be some big case in which there was a conspiracy to, you know, mislead the public, engage in securities fraud, misstate accounts. Nobody else was prosecuted. And I'll just address just the points I think that Ms. Ray was making in order. First of all, she says the defendant absolutely could have testified that he confessed because he had recognized that's not appropriate, obviously. No, no, no. Here's the point. Here's the point. She said, of course, he could have explained that he was cooperating because he had been falsely accused. I'll direct the court's attention to pages, I believe it's 3012 and 3013 of the record. There is no question about the fact that what the judge said is he could testify that he felt desperate and he told the government what he thought he wanted to hear because the government had accused him of deleting accounting emails with his superiors. But I gave the wrong, it's page 2665. The judge says there will be no testimony about whether the government did or did not have that evidence. The whole reason he didn't testify in this case was that all that the judge would allow him to do in order to explain why it is that he felt so desperate that he would cooperate with the government was that the government had accused him, this is coming at the very end of the trial in which the jury has heard nothing about this, that he was doing it because the government had accused him of massively deleting accounting emails with his superiors. In other words, he could have dug an even deeper hole for himself. And this was all fully explicated in the record. As to the accounting records, again, in this accounting case, Ms. Ray says that, well, under Rule 17C, we didn't give a narrow request. With all due respect, before the first trial, we really didn't know. The government refused all efforts to provide a bill of particulars as to what accounting records were false and inflated or anything like that. We had a very broad Rule 17C subpoena. But after the first trial, we specifically narrowed the subpoena to ask only for the company's accounting records, for which Mr. Rand had not had access since the day that he was thrown under the bus by the company, the very accounts, the seven specific accounts that the government had charged him with and had the government's evidence included in the first trial and the period for which we wanted access to these accounting records was the precise seven years that the government says that he was engaged in this conspiracy plus one prior year as a control. The notion that this was as specific as can possibly be in an era in which the government is saying there was a massive conspiracy to falsify the accounting records over a seven-year period. I mean, we didn't know that the government would continue to rely on seven specific accounts, but we only asked for those accounts. And the fact that we were, I mean, it's just amazing that in an accounting fraud case, we don't get, the chief accounting officer can't get access to the company's accounting records or derivatively to those records that Deloitte and Touche independently investigated. And, you know, at closing argument, we talked about the bags of gold. This was the bags of gold that this man used to buy his lawyers and his experts. And it's true that we had an expert who said, look, I wasn't given access to the accounting records, but looking at the public documents and looking at those accounting records that were produced in discovery in the SEC case before the prosecution shut that down, it looks to me like these accounting entries were entirely reasonable. And the response to that, well, that was just testimony bought with a bag of gold, was we have Deloitte and Touche, which had access to all of those papers, and the spreadsheets from these records and these accounts that they viewed are in the Deloitte and Touche records. Nobody denies that these are non-hearsay, utterly admissible records. And the judge would not allow us to make reference to those records either. And let me just go quickly to the obstruction count. I think that Ms. Ray made two points. One was that Deborah Danzig testified that shortly before she sent, a few minutes before she sent the hold notice to him, he had come into her office. Now, there was very substantial evidence from the actual documentary record in the case. I'm waving around the demonstratives at closing. I don't know why because it makes me feel better since they weren't in evidence. But if you look at the testimony of Anna Shelton, who was our expert, who testified minute by minute from 2.58 on to 7.37 p.m., what this guy was doing, it is utterly inconsistent with somebody who's frantically going through and trying to cover up some involvement in the mortgage case. And the testimony, the evidence in the case also was, Mr. Rand did not recall what time he went in to ask Ms. Danzig, does this hold e-mail mean, does it also include e-mails? But the documentary record in the case provides a pretty good reason for a jury to believe that Ms. Danzig was simply mistaken. That is, she sent the e-mail to him at 4.19, generally talking about, you have to pertain all records. Mr. Rand's question to her was, does this include e-mails? Her testimony was, yes, I was about to send a follow-up clarification e-mail, which the record shows she sent at 7.37 p.m., hours after he stopped deleting. On the issue of loss, Judge Harris, I mean I thought Ms. Ray said that there was testimony that she went into his office at that time, and he asked that question, and she said everything. And it seems to me, because of that question, it would be appropriate for her to go back and send an e-mail just to confirm it. But the testimony was that it was after their conversation that he deleted, right? So her testimony was, his testimony, her testimony was he went into her office and said, does this include e-mails? And she said, yes, I was about to send that. And the jury was certainly entitled to believe that in light of the fact that he got the general hold e-mail at 4.19 and opened it at 4.25, and her confirming e-mail that it includes, the direction that it includes e-mails came at 7.37, that their conversation was during that period of time. And finally, Judge Harris, on the issue of loss, we think here that there is just, there was the court erred as a matter of law in choosing either the August, the June disclosure that Mr. Rand had been fired for destroying documents, or the August disclosure that there was an investigation that Rand may have caused reserves in excess amounts, but that the company does not, it's ongoing and the company does not believe that the amounts were material. That under Dura and the cases that apply Dura, both in the criminal and civil context, the triggering event is not the announcement of an investigation into whether there were misstatements in the company's financial statements, but when there was actually disclosure, when the fraud itself was disclosed on the market. And that is the error of law. We think he's entitled to a new trial on constitutional fairness grounds, but a minimum ought to be resentenced using the, under Dura, using the October 11th disclosure date. One quick follow-up question. So if, assuming that we're right, what would the, and then I know your expert came in with a calculation of zero if you only look at October. So then what would the guidelines range be? Thirty to thirty-seven months. Thirty to thirty-seven months would be the guidelines range. With zero loss? With zero loss. And again, you know, the government dropped all of its securities fraud counts in this case. There was absolutely no evidence whatsoever that even assuming that Mr. Rand, that these teeny little insignificant accounting, reserve accounting things were wrong. They had no effect whatsoever on the company's financial statements. One last little question. I'm sorry. Sure, go ahead. And what if, I don't know if you know the answer to this question, what if June were out but August were in? If June were out and August were in, I'd have to go back and check the math, but I believe that the event study from their expert said that the loss would be, I think, $63 million. So under the $100 million threshold. And what does that reduce the guideline range? It was what, 51 was the range ultimately reached? Yes. It would probably be two or three, whatever the. On this I have to plead forgetfulness. I didn't know that, but I know that there's a big threshold jump at $100 million, but I don't know what the guideline range was. Thank you very much, Your Honor. Thank you. I'm just going to take a short recess. We'll come down to Greek Council and take a short recess. This Honorable Court will take a brief recess.
judges: Paul V. Niemeyer, Roger L. Gregory, Pamela A. Harris